# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

_____

SOGEFI USA, INC., SOGEFI AIR &
COOLING SYSTEMS, and SOGEFI
ENGINE SYSTEMS MEXICO S de RL de
CV,

          Plaintiffs,

v.                               Civil Action No.     3:22-cv-174

PARKER HANNIFIN CORPORATION,

          Defendant.

## VERIFIED COMPLAINT

Plaintiffs Sogefi USA, Inc., Sogefi Air & Cooling Systems, and Sogefi Engine Systems

Mexico S de RL de CV (together, "Sogefi") state the following for their verified complaint against

Defendant Parker Hannifin Corporation ("Parker"):

## Parties, Jurisdiction, and Venue

1.      Sogefi USA, Inc. is a West Virginia corporation with its principal place of business

in West Virginia.  Sogefi USA, Inc. operates a manufacturing plant in Prichard, West Virginia.

2.      Sogefi Air & Cooling Systems is a Canadian corporation that operates a

manufacturing plant in Montreal, Quebec, Canada.

3.      Sogefi Engine Systems Mexico S de RL de CV is a Mexican corporation that

operates a manufacturing plant in Apocada, Nuevo León, Mexico.

4.      Upon information and belief, Parker Hannifin Corporation is an Ohio corporation

that conducts business in West Virginia.

5.      The Court has subject matter jurisdiction over this matter under 28 U.S.C. §

1332(a)(3).

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

## The Parties' Supply Agreements

7.      Sogefi, as buyer, and Parker, as seller, are parties to a series of long-term contracts for the supply of various gasket and related component parts (the "Parts").[1]

8.      Sogefi incorporates the Parts into automotive products that it supplies on a just-in-time basis to its original equipment manufacturer ("OEM") customers, including Ford Motor Company, General Motors, and Stellantis, among others.

9.      Sogefi's North American General Purchasing Terms and Conditions (the "GTC") are expressly incorporated into the contracts of supply by reference.

10.     The contracts of supply and GTC contemplate that Sogefi will periodically communicate its quantity and timing needs for the Parts via material releases issued to Parker that specify the delivery location at one of Sogefi's plants located in West Virginia, Mexico or Canada, as well as quantity and delivery date.

11.     The contracts of supply, GTC, and material releases formed the binding contracts for the supply of Parts between the parties, and are hereinafter referred to as the "Supply Agreements."

12.     Under the Supply Agreements, Sogefi is obligated to purchase, and Parker is obligated to supply, all of Sogefi's requirements for the Parts.

13.     Sogefi issued the Supply Agreements to Parker, and Parker accepted the Supply Agreements and the incorporated GTC through, among other things, manufacturing and shipping the Parts subject to the Supply Agreements.

---

[1] Upon information and belief, Parker is in possession of the parties' contracts.

14.     The Supply Agreements have a term that lasts for the duration of the OEM's program production life, and Parker is expressly bound to continue supplying Sogefi's requirements as ordered for the duration of that term.

15.     The Supply Agreements also require timely delivery of all Parts ordered by Sogefi:

> Time and quantities are of the essence under this Order.  Seller agrees to 100% on-time delivery of the quantities and at the times specified by Buyer, as set forth in this Order . . . .   Failure to meet agreed delivery time and quantities shall be considered a breach of this Order and Seller shall pay to Buyer any damages or expenses imposed upon or incurred by Buyer as a result of such breach.  [GTC § 3(f).]

16.     Under the Supply Agreements, Parker is obligated to deliver all Parts ordered by Sogefi in releases on time and in the quantities ordered.

17.     The GTC further requires Parker to indemnify Sogefi for Parker's breach of the Supply Agreements:

> To the fullest extent permitted by law, Seller will defend, indemnify, and hold harmless Buyer . . . against all damages, claims, or liabilities and expenses (including attorneys' fees and other professionals' fees, settlements, releases and judgments) to the extent such damages, claims, or liabilities and expenses arise out of or relate in any way to Seller's representations, performance or obligations under this Order . . . .  [GTC § 12(a).]

18.     Recognizing the nature of the automotive industry and the need for just-in-time deliveries, the parties also agreed that money damages would be an inadequate remedy to Sogefi if deliveries are not made as required:

> In an action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies . . . breach of any agreement, order or the [GTC] . . . Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Order and . . . Buyer shall be entitled to specific performance and injunctive equitable relief . . . as well as Buyer's costs and reasonable attorneys' fees.  [GTC § 11(b).]

**To Resolve a Pricing Dispute in 2019, the Parties Enter into the Pricing Agreement**

19.     Under the Supply Agreements, the price of the Parts is "a firm fixed price" for the duration of the term and is "not subject to increase for any reason, including increased raw material costs, increased labor or other manufacturing costs, increased development costs, currency fluctuations or changes in volumes or program length from those estimated or expected[.]" (GTC § 2(a).)

20.     Further, the Supply Agreements may only be modified by "a written amendment executed by authorized representatives of each party." (GTC § 36.)

21.     In early 2019, a dispute arose between the parties regarding pricing of the Parts.

22.     To resolve their dispute, the parties agreed to adjust the pricing on certain Parts via a "Pricing Agreement."[2]

23.     Dated February 21, 2019, the Pricing Agreement expressly acknowledged the parties' ongoing Supply Agreements.

24.     The Pricing Agreement set new prices for certain Parts subject to the parties' Supply Agreements.

25.     The Pricing Agreement also stated that it would last for a term of three years, but that it would then automatically renew until the parties agreed to change pricing in another mutually signed agreement:

> This agreement is valid for an initial period of 3 years.  The Agreement shall automatically renew until or unless the parties agree in writing to amend or alter the applicable term of the Agreement.

26.     Similarly, the prices in the Pricing Agreement were to be fixed for the entire life of the agreement unless altered in a writing signed by both parties:

---

[2] Upon information and belief, Parker is in possession of the Pricing Agreement.

> Parker & Sogefi agree that the prices listed in Appendix A and B shall be firm and not subject to change for the term of this agreement (including renewal terms). . . . Any change to any price must be approved in advance and in a writing signed by both parties.

27.     The parties have never agreed to amend or end the term of the Pricing Agreement nor have they agreed to alter any of the prices in the Pricing Agreement.

28.     The Pricing Agreement also made clear that all of the other terms of the parties' Supply Agreements, including the provisions of the GTC, were not affected:

> Nothing in this Agreement shall modify or otherwise revise any agreements or contracts between Parker and Sogefi except as explicitly provided in this Agreement.

**Parker Repudiates the Supply Agreements and Pricing Agreement**

29.     The parties operated according to the Supply Agreements and under the pricing structure set forth in the Pricing Agreement for years without incident.

30.     But in late 2021, Parker started to voice discontent with the pricing structure it had agreed to years earlier.

31.     On October 27, 2021, Parker attempted to unilaterally impose new prices on all Parts by issuing a new quote, which attached its terms and conditions.

32.     Sogefi rejected this offer, but, in an effort to be a good business partner, offered to discuss modest price changes if the parties were able to reach a mutual agreement.

33.     Parker did not respond in kind.  Instead of negotiating with Sogefi, in February 2022, Parker started unilaterally invoicing Sogefi at Parker's preferred higher prices for all Parts.

34.     Sogefi again made it clear to Parker that Sogefi rejected Parker's attempt to alter the terms of the parties' fixed Supply Agreements and Pricing Agreement.

35.     In another attempt to reach a mutual agreement on modest price adjustments, Sogefi submitted an offer to Parker to increase some prices on March 24, 2022.

36.     But Parker refused to negotiate and instead issued a letter to Sogefi on April 4, 2022 that threatened to shut down Sogefi's supply chain.

37.     Parker's letter contained several statements that were blatantly false under the plain language of the parties' Supply Agreements and Pricing Agreement, including that "there is no signed long-term supply agreement between the parties" and that "the pricing agreement has expired."

38.     Parker concluded with the threat that it was placing Sogefi on a "credit hold" "effective April 8, 2022" for Sogefi's refusal to pay Parker's requested prices.  According to Parker, this meant that in order for Sogefi to continue to receive Parts under the Supply Agreements and the Pricing Agreement, Sogefi would need to either issue new Supply Agreements at 100% of Parker's desired prices or pay for Parts cash-in-advance at Parker's desired prices.

39.     This was a blatant breach of the parties' Supply Agreements and Pricing Agreement.

40.     In response, Sogefi's counsel sent Parker a request for adequate assurances on April 7, 2022 under UCC § 2-609.

41.     In that letter, Sogefi requested that Parker adequately assure Sogefi that Parker would continue to supply the Parts in accordance with the parties' Supply Agreements and Pricing Agreement, which required Parker to ship according to Sogefi's releases.

42.     Sogefi also reminded Parker that the parties' had contractually agreed to fixed pricing for the life of the Supply Agreements unless amended by mutual agreement.  In this way, Sogefi had assumed the risk that Parker's costs would go down and Parker assumed the risk that its costs would go up.

43.     Parker failed to provide adequate assurances as requested in Sogefi's correspondence.

44.     Instead, Parker responded that it was simply extending Sogefi's "credit" such that Parker would not ship Parts that are due to be delivered to Sogefi as early as April 15, 2022, breaching its obligations under the Supply Agreements.

45.     Parker has thus already fully repudiated the parties' Supply Agreements on multiple occasions, and refused to provide Sogefi with any assurances that Parker will continue to ship Parts.

46.     Should Parker carry through on its threat it continue to breach the parties' Supply Agreements, Sogefi currently estimates that it will begin to run out of Parts needed to produce automotive components for its OEM customers on April 22, 2022.

47.     Sogefi currently estimates that its own customers, the OEMs, will begin to experience shortages and line shutdowns one to three days after the first short shipment from Sogefi.

### Parker's Refusal to Ship Parts Requires Injunctive Relief

48.     Sogefi incorporates the Parts into automotive components that Sogefi produces and sells to its OEM customers on a just-in-time basis.

49.     Just-in-time delivery in the automotive industry requires that Parker produce and deliver the Parts to Sogefi on a timely basis so that Sogefi can produce and deliver components to its OEM customers on a timely basis; otherwise, the entire supply chain falters, reducing or potentially stopping production at Sogefi and its major OEM customers' plants.  Such reductions and shutdowns would affect suppliers up and down the supply chain.

50.     The just-in-time delivery model that is standard in the automotive industry means that neither Sogefi nor its customers have a sufficient inventory of excess Parts or components.

51.     As Parker is aware, it is Sogefi's sole supplier for the Parts.  Further, the Parts are unique in that they are designed and manufactured to meet the particular specifications of Sogefi and its OEM customers.  Accordingly, Sogefi requires customer approval for its supply of the Parts.  As a result, Sogefi cannot simply replace Parker with another Parts supplier in time to avoid supply chain disruptions.

52.     Because of this just-in-time supply chain, any delay in delivery of the Parts or a delivery of less than the required quantities of Parts can lead to a shutdown of manufacturing up and down the supply chain.

53.     Parker knows that abruptly reducing deliveries of the Parts will cause catastrophic harm to Sogefi and its major OEM customers.  Indeed, Sogefi advised Parker of this potential harm.

54.     Such catastrophic harm will include, but is not limited to, Sogefi and its major OEM customers reducing or stopping production for components and vehicles related to the Parts.

55.     These production reductions or stoppages would result in Sogefi and its OEM customers sending employees home and incurring hundreds of thousands to millions of dollars per hour in reduction or stoppage costs.

56.     Additional effects will be felt down the supply chain.  Suppliers of other parts and components to Sogefi's OEM customers will also be forced to shut down.

57.     These widespread and dramatic consequences would cause Sogefi to suffer irreparable harm to its goodwill and reputation in the automotive industry in the event Parker reduces delivery of the Parts.

58.     Sogefi is left with no recourse but to seek immediate relief from this Court to avoid irreparable harm.

## COUNT I
## Breach and Anticipatory Breach of Contract

59.     Sogefi incorporates by reference in this Count I all preceding allegations in this Complaint.

60.     Sogefi and Parker have valid and mutually binding contracts that requires Parker to timely supply Sogefi with all ordered quantities of the Parts at the prices set forth in the Supply Agreements or else the Pricing Agreement.

61.     Sogefi has fulfilled all of its contractual obligations under the Supply Agreements and Pricing Agreement.

62.     Parker's stated intention not to timely deliver the ordered quantities of Parts to Sogefi at the prices set forth in the Supply Agreements or Pricing Agreement is a breach of Parker's contractual obligations.

63.     Parker has also anticipatorily breached the parties' Supply Agreements by stating an intent to halt delivery of all Parts to Sogefi for the foreseeable future.

64.     Parker expressly repudiated the parties' Supply Agreements altogether by stating in a letter that "there is no signed long-term supply agreement between the parties."

65.     If Parker does not continue to supply the Parts, Sogefi will be unable to fulfill its obligations to supply its major OEM customers with the Sogefi products into which the Parts are incorporated, and Sogefi will be forced to dramatically reduce or shut down its plant operations relating to the Parts.

66.     Similarly, without the finished Sogefi components incorporating the Parts, Sogefi's major OEM customers' production lines related to the vehicles involved will be dramatically reduced or shut down, resulting in numerous idle plants and potential layoffs.

67.     Parker would be responsible for the monetary damages for these line shutdowns caused by its breach of the Supply Agreements and Pricing Agreement.

68.     Sogefi's ability to locate an alternate supplier and obtain the OEMs' approval before such a shutdown is simply not possible.

69.     If Parker carries though on its anticipatory repudiation and does not perform its obligations, Sogefi will have no adequate remedy at law for the harm caused by such breach.

70.     The parties expressly agreed that injunctive relief is an appropriate remedy in such a circumstance.  (*See* GTC § 11(b).)

71.     Additionally, Sogefi has or will suffer damages in an amount greater than $75,000 as a result of Parker's breaches, including costs and fees to-be incurred to Sogefi's customers, any resulting alleged liability imposed upon Sogefi by Sogefi's customers, damage to Sogefi's business reputation, and attorneys' fees and costs.

## COUNT II
## <u>Declaratory Judgment</u>

72.     Sogefi incorporates by reference in this Count II all preceding allegations in this Complaint.

73.      There is an actual case in controversy between the parties for which declaratory judgment is appropriate under 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57.

74.     Parker has contractual obligations to continue to supply the Parts to Sogefi under the Supply Agreements at the prices agreed upon in the Supply Agreements and Pricing Agreement.

75. Sogefi has fully complied with all of its obligations under the Supply Agreements and Pricing Agreement.

76. Despite this, and despite the parties' years-long supply relationship, Parker asserted that the parties do not have any long-term supply agreements.

77. The consequence of this disagreement between Sogefi and Parker is significant, as it could result in a shutdown of automotive production at major OEM plants around the country.

78. To avoid this significant public and private harm, and to provide the parties with needed clarity regarding the extent of their contractual obligations, Sogefi requests a declaratory judgment that the parties' are bound by the Pricing Agreement and Supply Agreements, which require Parker to supply Sogefi with the quantities of Parts as ordered by Sogefi and at the contractual prices.

### Relief Requested

Sogefi requests the following relief from this Court:

A. Injunctive relief preventing Parker from taking any action inconsistent with its supply obligations to Sogefi under the Supply Agreements and Pricing Agreement;

B. An order of specific performance and/or mandatory injunction requiring Parker to continue to supply Sogefi with the ordered quantities of the Parts under the Supply Agreements and at the prices agreed upon in the Supply Agreements and the Pricing Agreement;

C. A judgment declaring that the parties are bound by the Supply Agreements, which require Parker to supply Sogefi with the quantities of Parts as ordered by Sogefi;

D. A judgment declaring that the parties are bound by the Supply Agreements and Pricing Agreement, which requires Parker to supply Sogefi with the Parts at the contractual prices;

E. Monetary damages suffered by Sogefi due to Parker's actions;

F.      An award of attorney's fees and other costs arising out of Parker's breaches under the parties' Agreements, as provided for in the GTC; and

G.      All other relief as the Court may deem just, equitable or appropriate under the circumstances.

## Verification

I declare under penalty of perjury that the contents of the foregoing complaint are true and accurate to the best of my knowledge, information, and belief.

Executed on: April 8, 2022

Todd Gregory
Plant Buyer
Sogefi USA, Inc.

Dated:  April 8, 2022                    By: */s/Megan Farrell Woodyard*
                                        Joseph Bunn, Esq. (WVSB No. 11319)
                                          STEPTOE & JOHNSON PLLC
                                          P.O. Box 1588
                                          Charleston, West Virginia 25326-1588
                                          (304) 353-8000
                                          (304) 933-8704 facsimile
                                          joe.bunn@steptoe-johnson.com

Megan Farrell Woodyard, Esq. (WVSB No. 11163)
STEPTOE & JOHNSON PLLC
P.O. Box 2195
Huntington, West Virginia 25772-2195
(304) 522-8290
(304) 522-8089 facsimile
megan.woodyard@steptoe-johnson.com

Michael G. Brady, Esq. (MI Bar No. P57331)
Laura N. You, Esq. (MI Bar No. P76416)
Adam T. Ratliff, Esq. (MI Bar No. P79892)
WARNER NORCROSS + JUDD LLP
2715 Woodward Ave., Ste. 300
Detroit, Michigan 48201
(313) 546-6000
mbrady@wnj.com
lyou@wnj.com
aratliff@wnj.com

*Attorneys for Plaintiff*